Joan MAERTIN, et al., Plaintiffs,

v.

ARMSTRONG WORLD INDUSTRIES, INC., et al., Defendant.

Civil No. 01–5321(JBS).

United States District Court, D. New Jersey.

Dec. 11, 2002.

Gary D. Ginsberg, Esquire, Law Office of Gary D. Ginsberg, Mount Laurel, NJ, for Plaintiffs.

James N. Lawlor, Esquire, Adam G. Brief, Esquire, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Defendant Armstrong World Industries, Inc.

John C. Sullivan, Esquire, Post & Schell, Esqs. Voorhees, NJ, for Defendants Liberty Mutual Insurance Co. and Michael Carroll.

Seth Goodman Park, Esquire, Siegal & Napierkowski, Cherry Hill, NJ, for Defendant Cravens, Dargan Co., Pacific Coast, as managing general agent for Central National Insurance Co. of Omaha.

Copernicus T. Gaza, Esquire, Traub, Eglin, Lieberman, Straus, Edison, NJ, for Defendant OneBeacon Insurance Co., formerly CGU Group, successor to Potomac Insurance Co.

## OPINION

SIMANDLE, District Judge.

This case involves the payment of a multi-million dollar settlement agreement to plaintiffs who were exposed to the cancer-causing substance known as polychlorinated biphenyl. Plaintiffs have sought payment from defendant Armstrong World Industries, which is now a debtor in Chapter 11 Bankruptcy, and from its insurance carriers, and have alleged that Armstrong and its employee Bethann Jakoboski, and Liberty Mutual Insurance Company and its employee Michael Carroll committed fraud and bad faith in the negotiations that led up to the settlement agreement.

Three separate motions are before the Court at this time: (1) the motion of defendants Central National Insurance Co. and CGU Group to dismiss plaintiffs' complaint; (2) the motion of defendants Liberty Mutual Insurance Company and Michael Carroll to dismiss plaintiff's second amended complaint; and (3) the motion of defendants Armstrong World Industries and Bethann Jakoboski to dismiss or for summary judgment.

This Court will consider each motion in turn and will deny the motion to dismiss of defendants Central National and CGU Group, will deny in part the motion to dismiss of defendants Liberty Mutual and

Michael Carroll as to the claims in Count I of plaintiffs' complaint and the fraud claims in Count II of plaintiffs' complaint but will grant it in part as to the bad faith claims in Count II of plaintiffs' complaint, and will deny the motion to dismiss of defendants Armstrong World Industries and Bethann Jakoboski but will grant the motion for summary judgment of defendants Armstrong and Jakoboski as to the bad faith and fraud claims in Count II of plaintiffs' complaint.

## I. BACKGROUND

In a 2000 settlement agreement, Armstrong World Industries ("Armstrong") agreed to pay plaintiffs seven million dollars. The agreement settled two actions in the United States District Court for the District of New Jersey, *Maertin, et al. v. Armstrong World Industries, Inc.*, No. 95–2849(JBS), ("*Maertin I* "), and *Schmoll v. Armstrong World Industries, Inc.*, No. 99–3497(JBS),[1] brought by plaintiffs who had either contracted, or feared contracting, cancer as a result of their exposure to ceiling tiles manufactured by Armstrong that had been installed in their workplace at Burlington County College. Armstrong manufactured and distributed the ceiling tiles from about August 1968 to April 1970; they were coated with a plasticizer that included the carcinogen polychlorinated biphenyl ("PCB").

The case was heavily litigated until the parties reported a settlement on September 14, 2000. This Court issued an order of dismissal and the parties entered into a "Settlement Agreement and Mutual General Release." The settlement agreement was signed by all parties on or before November 22, 2000; Armstrong signed the agreement on November 6, 2000. (11/28/2001 O'Connor Cert.) Under the terms of the agreement, Armstrong was to make the $7,000,000 payment to plaintiffs' counsel on or before January 21, 2001.[2] (Def. Craven's Br. at 2.)

On September 20, 2000, Armstrong filed *Armstrong World Industries, Inc. v. Central National Insurance Co. of Omaha, et al.*, Civil Number 00–4763, in the Eastern District of Pennsylvania against its insurance carriers seeking a declaration of coverage for the settlement amount.

On December 6, 2000, Armstrong filed bankruptcy under Chapter 11 in the District of Delaware. (*Id.* at 3.) Armstrong, continuing to operate its business as a debtor in possession, notified plaintiffs of the bankruptcy action and reminded them that any collection action was stayed by the Bankruptcy Code's automatic stay provision. (*Id.*) The Armstrong case in the Eastern District of Pennsylvania was also stayed. (Gangl Cert. ¶ 7.)

Plaintiffs filed for relief from the automatic stay on March 29, 2001 to seek payment of the settlement amount. On November 5, 2001, the Honorable Joseph J. Farnan, United States District Judge, presided over a hearing regarding the automatic stay. (Raditz Cert., Ex. C.) Counsel for plaintiffs informed the court:

> I think at this point, your Honor, what we would like the Court to do is grant relief from the automatic stay to allow the Maertin plaintiffs to go back to the District Court for the District of New Jersey, deal with whatever rights they have there, assert any action they may

---

**1.** *Schmoll v. Armstrong World Industries, Inc.*, No. 99–3497(JBS), was administratively terminated without prejudice on December 6, 1999.

**2.** Due to a confidentiality provision in the agreement, this Court is only aware of the agreement's terms to the extent that they have been disclosed by the parties. (*See* Raditz Cert., Ex. B at 5, n. 2.)

have there in New Jersey law against any of the insurance carriers who may have been involved . . . In the event that it can't be resolved there, the Maertin plaintiffs can certainly move to intervene in the Eastern District of Pennsylvania . . .

(*Id.,* Tr. 33:24–34:7, 22–25.) Judge Farnan granted their application, stating from the bench on November 5, 2001, "I'll grant the application and enter an order for that tomorrow." (*Id.,* Tr. 39:23–24.)

The proceeding then continued so the parties could clarify the effect that lifting the stay would have on litigation against Armstrong's insurance providers. Counsel for International Insurance Co. asked the Court "to be clear that you're lifting the stay as to proceeding against the debtor only and not as to any actions or direct actions against any of the insurance carriers." (*Id.,* Tr. 40:7–10.) The Court responded that "[t]he stay only applies to the debtor." (*Id.,* Tr. 40:11.) Counsel for plaintiffs, however, responded by stating, "I want to make sure counsel isn't indicating we may be stayed from proceeding against an insurance carrier as well." (*Id.,* Tr. 40:24–41:1.) Counsel for International Insurance Co. responded by asking "[t]he issue is, can they institute or commence an action against insurance proceeds that are stayed," (*Id.,* Tr. 41:6–7), and the Court answered by stating "some federal judge is going to decide that, if you are sued, and raise it or they're going to refer it back here. But for today, I'm lifting the stay against the debtor and that's all I have the authority to do," (*Id.,* Tr. 41:9–14).

Judge Farnan filed his memorandum order on December 10, 2001 which lifted the stay to allow plaintiffs to pursue the en-

forcement of the settlement agreement, stating:

NOW THEREFORE, IT IS HEREBY ORDERED that having considered the Motion for Relief from the Automatic Stay filed by the Maertin Plaintiffs in an action pending in the United States District Court for the District of New Jersey, Civil Action No. 95–CV–02849, and the responses thereto, the Motion is hereby *GRANTED.*

The Automatic Stay set forth in 11 U.S.C. § 362 is modified to permit the Maertin Plaintiffs to proceed with the New Jersey Action and pursue any rights that they may be permitted under applicable state and federal law in connection with that action, in state or federal court.

(12/10/01 Order of Hon. Joseph J. Farnan at 3.) Meanwhile, on November 14, 2001, before the actual written order was entered, plaintiffs filed a complaint with this Court against Armstrong, Liberty Mutual Insurance Co.,[3] Central National Insurance Co. of Omaha, Certain London Market Insurance Companies, CGU Group, Equitas Reinsurance Limited, First State Insurance Co., International Insurance Co., Puritan Insurance Co., and Peter E.J. Cameron–Webb for a declaratory judgment that the insurers pay the settlement agreement amount and against Armstrong, Liberty Mutual Insurance Company, Michael Carroll, and Bethann Jakoboski for money damages for fraud, bad faith, and concealment during the settlement negotiations. ("*Maertin II* ")(Raditz Cert., Ex. D.)

Plaintiffs also filed a Notice of Motion to Enforce Settlement as to Defendant Armstrong in *Maertin I* on November 30, 2001. There, the Honorable Joel B. Rosen, in a

---

**3.** Liberty Mutual Insurance Co. was incorrectly identified as Liberty Mutual Group in the caption of plaintiffs' complaint. This Court will refer to Liberty Mutual Insurance Co. by its proper name.

Report and Recommendation filed pursuant to 28 U.S.C. § 636(b)(1)(B), found that this Court had jurisdiction to enforce the settlement agreement, that the settlement agreement was a valid and binding agreement, and that this Court has authority to enforce the agreement even though the bankruptcy court has exclusive jurisdiction to compel the debtor's payment of the settlement amount. (Report and Recommendation.) After considering Defendant Armstrong's objections to the Report and Recommendation, on September 5, 2002 this Court affirmed Judge Rosen's Report and Recommendation and entered judgment against Defendant Armstrong in the amount of $7,000,000 so that the plaintiffs could compel payment in the United States Bankruptcy Court.

Meanwhile, before this Court in *Maertin II*, plaintiffs continued their action seeking payment of settlement amounts from the defendant insurers. On March 21, 2002, defendant Cravens, Dargan Co., Pacific Coast, as managing general agent for Central National Insurance Co. of Omaha, (collectively "Central National"), filed a motion to dismiss or, in the alternative, to stay the instant action. [Docket Item 17–1.] In a letter dated March 22, 2002, defendant CGU Group, now OneBeacon Insurance Co., joined and adopted Central National's motion to dismiss. (OneBeacon 3/22/02 Ltr.) On March 25, 2002, Armstrong filed a motion to dismiss or for summary judgment. [Docket Item 24–1.]

On March 28, 2002 this Court dismissed without prejudice defendants Michael Carroll, First State Insurance Co., and Westport Insurance Co., successor to Puritan Insurance Co. [Docket Items 29–1, 30–1.] On April 10, 2002, plaintiffs filed an amended complaint, and on April 17, 2002, plaintiffs filed a second amended complaint. [Docket Items 31–1, 32–1.]

On May 3, 2002, the Honorable Randall J. Newsome, United States Bankruptcy Judge for the District of Delaware, signed a stipulation and order agreed upon by plaintiffs and Armstrong which stated that plaintiffs could proceed against Armstrong's insurance policies because the bankruptcy stay had been lifted to allow such an action and because plaintiffs held the "equivalent" of a judgment returned unsatisfied from Armstrong. (Pls.' Br. Ex. A.)

On June 3, 2002, defendants Liberty Mutual Insurance Company and Michael Carroll[4] filed a motion to dismiss the second amended complaint. [Docket Item 38–1.] On June 4, 2002, Central National contested the submission of the May 3rd bankruptcy order and submitted a copy of its reconsideration motion filed with Judge Newsome. (Central National 6/4/02 Ltr., Ex. 2.)

The remaining defendants in this action are Armstrong, Liberty Mutual Insurance Company, Central National Insurance Co. of Omaha, Certain London Market Insurance Companies, CGU Group (presently called OneBeacon Insurance), Equitas Reinsurance Limited, International Insurance Co., Peter E.J. Cameron–Webb, Bethann Jakoboski, Michael Carroll, and Certain

---

**4.** On March 28, 2002, counsel for plaintiffs and for defendant Liberty Mutual agreed to a stipulated order of dismissal without prejudice for defendant Michael Carroll. [Docket Item 29–1.] However, plaintiffs assert claims against Michael Carroll in their amended complaint, second amended complaint, and third amended complaint. Liberty Mutual informed the Court in its brief that plaintiffs advised them that the inclusion of the claims against Michael Carroll in the amended complaints was unintentional. (Liberty Mutual Br. at 1, n. 1.) However, this Court must consider the claims against Michael Carroll because no order of dismissal has been entered since the current claims were asserted against him.

Underwriters at Lloyd's London. Presently before this Court is the motion to dismiss of defendants Central National and CGU Group, [Docket Item 17–1], the motion to dismiss of defendants Liberty Mutual and Michael Carroll, [Docket Item 38–1], and the motion for summary judgment of defendants Armstrong and Bethann Jakoboski, [Docket Item 24–1].

## II. DISCUSSION

### A. Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction

In all three motions before this Court, the defendants argue that this Court should dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) because it does not have subject matter jurisdiction over this action since Armstrong is in bankruptcy and the bankruptcy automatic stay was not lifted to allow this action. (Central National Br. at 4–6; Armstrong Br. at 15–16; Liberty Mutual Br. at 4.) As an initial matter, therefore, this Court will determine whether it has subject matter jurisdiction.

In a Memorandum Opinion and Order filed December 10, 2001, the Honorable Joseph Farnan, United States District Judge for the District of Delaware, lifted the bankruptcy automatic stay to "permit the Maertin Plaintiffs to proceed with the New Jersey Action and pursue any rights that they may be permitted under applicable state and federal law in connection with that action, in state or federal court." (12/10/01 Order of Hon. Joseph J. Farnan at 3.) Defendants do not dispute that the stay was lifted to allow plaintiffs to proceed with the *Maertin I* action against Armstrong for payment. (Central National Br. at 6.) They argue, however, that the stay was not lifted to allow plaintiffs to file this new action against Armstrong and its insurers. (*Id.*)

When considering a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P 12(b)(1), the court must accept as true all material allegations of the complaint and construe that complaint in favor of the non-moving party. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The court's focus must not be on whether the factual allegations would entitle the plaintiff to relief, but instead should be on whether this Court has jurisdiction to hear the claim and grant relief. *New Hope Books, Inc. v. Farmer,* 82 F.Supp.2d 321, 324 (D.N.J.2000). To determine this, the Court can find facts based on affidavits or materials submitted to the Court. *Id.*

To determine whether this Court has jurisdiction to hear the present dispute, the Court must determine (a) whether this Court has diversity jurisdiction over the matter; (b) whether the insurance proceeds are part of the bankruptcy estate and subject to the automatic stay; (c) whether the automatic stay was lifted to allow an action against the insurance companies for the proceeds; and (d) whether the present action is allowed when it was filed after the hearing before Judge Farnan but before Judge Farnan issued his written order lifting the stay.

This Court finds that there is subject matter jurisdiction over the action because the automatic stay was lifted to allow the present action against Armstrong's insurance companies. This Court thus agrees with the conclusion reached by the Honorable Randall J. Newsome, United States Bankruptcy Judge for the District of Delaware, in his May 3, 2002 stipulation and order.

### (a) Diversity jurisdiction

Federal courts are courts of limited jurisdiction that may only hear a case if the constitution or a federal statute pro-

vides the court with jurisdiction. *Kokko-nen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Here, the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.[5]

### (b) Insurance as part of bankruptcy estate

Defendants argue that the insurance proceeds that plaintiffs seek are part of Armstrong's bankruptcy estate. If they are, then this Court would only have jurisdiction if the bankruptcy automatic stay was lifted to allow an action against the insurance carriers.

■ The filing of a bankruptcy petition operates to stay "any act to obtain possession of property of the estate ... or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). "Property of the estate" is defined in section 541(a) of the Bankruptcy Code as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). The definition of property is intended to be "broad and all-inclusive." *Minoco Group v. First State Underwriters,* 799 F.2d 517, 518 (9th Cir.

1986) (quoting *In re Bialac,* 712 F.2d 426, 430 (9th Cir.1983) and citing S.Rep. No. 95–989, 95th Cong., 1st Sess. 82, U.S.Code Cong. & Admin. News 1978, p. 5787 (1978)).

■ The Third Circuit has held that insurance policies fit within section 541's definition of "property of the estate." *First Fid. Bank v. McAteer,* 985 F.2d 114, 116 (3d Cir.1993) (citing *Estate of Lellock v. Prudential Ins. Co.,* 811 F.2d 186, 189 (3d Cir.1987)); *Hanover Ins. Co. v. Tyco Indus., Inc.,* 500 F.2d 654, 656 (3d Cir. 1974). The Third Circuit has thus followed the general rule that insurance policies which provide coverage for a debtor's liability belong to the debtor's estate. *See, e.g. In re Dow Corning Corp.,* 86 F.3d 482, 495 (6th Cir.1996); *In re Titan Energy, Inc.,* 837 F.2d 325, 329 (8th Cir.1988); *In re Minoco Group of Cos.,* 799 F.2d 517, 519 (9th Cir.1986); *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1001 (4th Cir.1986); *In re Davis,* 730 F.2d 176, 184 (5th Cir.1984). The general rule is the same for proceeds of the insurance policies, but includes one exception, not relevant to the present situation.[6]

---

5. Here, the amount in controversy exceeds $75,000 because the payment of a $7,000,000 settlement amount is at issue and the parties are citizens of different states. Plaintiffs are all citizens of either New Jersey or Florida. (Raditz Cert., Ex. D at 4–5.) Defendants are citizens of Pennsylvania, Massachusetts, Nebraska, Connecticut, Illinois, Missouri, and the United Kingdom. (*Id.* at 5–8.) While plaintiffs initially indicated that Bethann Jakoboski was a citizen of New Jersey in their complaints, this Court requested proof of subject matter jurisdiction in a letter dated October 2, 2002, and is satisfied that Bethann Jakoboski is a citizen of Pennsylvania. Counsel for plaintiffs submitted an affidavit indicating that the New Jersey notation was a typographical error. (Ginsberg Aff. ¶¶ 2–3; Ginsberg 10/17/02 Ltr.)

6. In general, the insurance proceeds are part of the debtor's estate; however, they are not if, before commencement of the bankruptcy proceedings, the debtor made an absolute assignment of his interest in the proceeds of the policy. *See Excelsior Ins. Co. v. Pennsbury Pain Ctr.,* 975 F.Supp. 342, 346, 353 (D.N.J. 1996) (finding proceeds not in estate when settlement agreement released debtor from liability in exchange for assignment of rights against insurer). The assigned proceeds are not part of the bankruptcy estate because the assignment divested the debtor of his ownership interest in the proceeds and "the estate in bankruptcy only includes property to which the debtor would have had a right if the debtor were solvent." *Id.; McAteer,* 985 F.2d at 117; *see also In re Louisiana World Exposition, Inc.,* 832 F.2d 1391, 1401 (5th Cir.1987) *cited in McAteer,* 985 F.2d at 117 (explaining that when purchaser of insurance policy "as-

Here, therefore, it is clear that the insurance policies are part of Armstrong's bankruptcy estate and this Court finds that the insurance proceeds are property of Armstrong's estate as well. Nothing indicates that Armstrong assigned its interest in the insurance proceeds to plaintiffs. Counsel for the insurance companies testified at the stay proceeding that "[t]here is no money set aside. There is no equitable trust. There is nothing. There was a settlement claim." (Raditz Cert., Ex. C at Tr. 37:18–20.) Plaintiffs argue that the act of entering the settlement agreement should have implicitly assigned them rights to Armstrong's insurance proceeds. (Pls.' Br. at 11.) Before filing for bankruptcy, Armstrong did agree to pay plaintiffs, and may have even intended to use the insurance proceeds to do so, but because it did not affirmatively and explicitly assign its rights in the policies to plaintiffs, this Court must follow the general rule and find that the debtor's liability insurance policies and their proceeds are property of Armstrong's estate.

### (c) Effect of lifting of automatic stay

■ Because the insurance policies and proceeds are property of Armstrong's bankruptcy estate, this Court must determine whether Judge Farnan lifted the automatic stay to allow claims against the insurance carriers. Plaintiffs argue that Judge Farnan used language that was broad enough to allow such an action. Defendants, however, argue that Judge Farnan intended to lift the stay so that the plaintiffs could seek enforcement of the settlement agreement in the *Maertin I* action against Armstrong. They argue that Judge Farnan did not lift the stay to allow this new action against new defendants.

■ If Judge Farnan's order is not clear, the meaning of an unclear court order "must be determined by what preceded it and what it was intended to execute." *Hendrie v. Lowmaster*, 152 F.2d 83, 85 (6th Cir.1945) (quoting *Union Pac. R. Co. v. Mason City & Fort Dodge R. Co.*, 222 U.S. 237, 247, 32 S.Ct. 86, 56 L.Ed. 180 (1911)). The court may thus consider the entire record and the circumstances which surrounded the order. *Houghton v. Am. Guar. Life Ins. Co.*, 692 F.2d 289, 296 (3d Cir.1982); *see also Sec. Mut. Cas. Co. v. Century Cas. Co.*, 621 F.2d 1062, 1066 (10th Cir.1980) (citing *Union Pac.*, 222 U.S. at 247, 32 S.Ct. 86). If the order is susceptible to two interpretations, it is the duty of the court to adopt the one "which renders it more reasonable, effective and conclusive in the light of the facts and the law of the case." *Hendrie*, 152 F.2d at 85 (quoting *Pen–Ken Gas & Oil Corp. v. Warfield Natural Gas Co.*, 137 F.2d 871, 885 (6th Cir.1943)).

Here, Judge Farnan's December 10, 2001 written order stated:

NOW THEREFORE, IT IS HEREBY ORDERED that having considered the Motion for Relief from the Automatic Stay filed by the Maertin Plaintiffs in an action pending in the United States District Court for the District of New Jersey, Civil Action No. 95–CV–02849, and the responses thereto, the Motion is hereby *GRANTED*.

The Automatic Stay set forth in 11 U.S.C. § 362 is modified to permit the Maertin Plaintiffs to proceed with the New Jersey Action and pursue any rights that they may be permitted under

---

signs its proceeds elsewhere, the assignee or beneficiary owns the proceeds and the [debtor's] estate does not"); *Lellock*, 811 F.2d at 190 (finding absolute assignment of policy to bank transferred all debtor's interest in proceeds and took them out of bankruptcy estate).

applicable state and federal law in connection with that action, in state or federal court.

(Raditz Cert., Ex. E. at 3.) This Court finds that the order lifted the stay to allow plaintiffs to continue civil action 95–CV–02849 and to file any action necessary to pursue the rights that they asserted or may have in connection with the 95–CV–02849 action. The Court, thus finds that the Order lifted the stay to allow the present action.

Defendants are correct that Judge Farnan did not clarify whether a proceeding against Armstrong's insurance companies would be allowed during the November 5, 2001 hearing. Counsel for the plaintiffs had asked the Court for:

> relief from the automatic stay to allow the Maertin plaintiffs to go back to the District Court for the District of New Jersey, deal with whatever rights they have there, assert any action they may have there in New Jersey law against any of the insurance carriers who may have been involved ...

(Raditz Cert., Ex. C. at Tr. 33:24–34:5.) After hearing arguments from counsel for the insurance carriers, Judge Farnan stated that "I'm going to grant the application as to the stay as to these plaintiffs." (*Id.* at Tr. 39:16–17.)

The proceeding, however, was complicated by the fact that the parties continued to argue about the status of the insurers. Counsel for some of the insurers then stated that "I just want to be clear that you're lifting the stay as to proceeding against the debtor only and not as to any actions or direct actions against any of the insurance carriers," (*Id.* at Tr. 40:7–10), and the judge responded that "[t]he stay only applies to the debtor," (*Id.* at Tr. 40:11). Counsel for plaintiffs then tried to clarify, stating that "I want to make sure counsel isn't indicating we may be stayed from proceeding against an insurance carrier as well." (*Id.* at Tr. 40:24–41:1.) The Court answered that:

> either in the Eastern District of Pennsylvania or District of New Jersey, some federal judge is going to decide that, if you are sued and raise it, or they're going to refer it back here. But for today, I'm lifting the stay against the debtor and that's all I have the authority to do.

(*Id.* at Tr. 41:9–14.)

The matter was officially resolved with Judge Farnan's December 10, 2001 order. Its plain language indicates that the stay was lifted for this action as it states that the automatic stay was modified to permit the Maertin Plaintiffs to proceed with the New Jersey Action *and* to pursue any rights that they may be permitted under applicable state and federal law in connection with that action, in state or federal court. The use of the word "and" sets off the two actions allowed, one a continuation of the *Maertin I* action and one a new action, in state or federal court. If Judge Farnan had not intended to allow a new, separate action, he would have had no reason to allow plaintiffs to pursue an action "in state or federal court."

This action fits within the order's definition of the new actions allowed. The order states that the Maertin plaintiffs could pursue "*any rights* that they may be permitted under applicable state and federal law *in connection with that action.*" (Raditz Cert., Ex. E. at 3) (emphasis added). This action against Armstrong and its insurers for damages obtained from the *Maertin I* action would surely qualify as "any rights ... in connection with [the *Maertin I* ] action."

Defendants, however, focus on the Court's finding that the "debtor is a solvent, going concern" to argue that the

Court intended that the plaintiffs could only seek payment from the debtor. (*Id.*) However, the Court actually stated that one reason that the stay should be lifted is that because the debtor is a solvent, going concern, "there would be minimal, if any, impact on the Debtor's resources available to pay other pre and post petition claimants." (*Id.* at 2–3.) In so doing, contrary to defendants' assertion, the Court actually indicated that there may be an impact, though hopefully a minimal one, on Armstrong's insurance resources.

For these reasons, this Court finds that the December 10, 2001 court order lifted the stay to allow the present action against Armstrong and its insurers.

### (d) Action filed after hearing but before written order

 This action was filed after the November 5, 2001 proceeding, but before the December 10, 2001 order. Defendants thus argue that the filing should be dismissed as premature because it was filed while the automatic stay was still in place.

 It is well-settled that during the pendency of a debtor's bankruptcy proceeding, parties generally cannot undertake any judicial action absent relief from the stay. *Maritime Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1206 (3d Cir.1991). However, the Third Circuit, while noting that such actions taken in violation of the automatic stay are generally void *ab initio,* there are some situations which warrant an exception to the rule. *In re Siciliano,* 13 F.3d 748, 750 (3d Cir. 1994). In such situations, the judicial proceeding is technically conducted in violation of the stay, but the interests of equity and judicial economy should allow it to proceed. *Excelsior Ins. Co. v. Pennsbury Pain Ctr.,* 975 F.Supp. 342, 352 (D.N.J. 1996) (citing *Siciliano,* 13 F.3d at 750–51). Courts have authority to cure these acts, that otherwise would be void for violating

the automatic stay, pursuant to 11 U.S.C. § 362(d). *Siciliano,* 13 F.3d at 751 (finding that statute, by providing authority to annul bankruptcy stay, authorizes court to validate actions taken during stay).

Here, this Court finds that this action, even if filed while the automatic stay was not technically lifted, should continue. The parties could reasonably rely on Judge Farnan's statement from the bench that he would enter an order granting the motion for relief from the stay. Judge Farnan made that determination on November 5, 2001, nine days before the present complaint was filed. The parties have filed papers with this Court for almost one year, and would likely simply file the action and all these related motions again if this Court dismissed the action for this reason. If this complaint was premature when filed, that prematurity was cured upon Judge Farnan's entry of the memorandum order on December 10, 2001. Therefore, judicial economy and equity support the continuance of this action and this Court will deny defendants' motions to dismiss for lack of subject matter jurisdiction.

### B. Motion of Central National, CGU Group, and Liberty Mutual to Dismiss for Failure to State a Claim Under New Jersey Statutory Law

In defendant Central National's motion to dismiss, joined by Defendant CGU Group, and in defendant Liberty Mutual's motion to dismiss, the defendants argue that this Court must dismiss plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(6) because plaintiffs have no right to relief under New Jersey statutory law until they deliver a judgment to Armstrong and have it returned unsatisfied due to bankruptcy. (Central National Br. at 2; 3/22/02 CGU Group Ltr; Liberty Mutual Br. at 6.)

The Supreme Court has held that a Rule 12(b)(6) motion must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A district court must accept any and all reasonable inferences derived from those facts. *Glenside West Corp. v. Exxon Co., U.S.A.*, 761 F.Supp. 1100, 1107 (D.N.J.1991); *Gutman v. Howard Sav. Bank*, 748 F.Supp. 254, 260 (D.N.J.1990).

A complaint should be dismissed if, accepting all plaintiff's allegations and the reasonable inferences to be drawn from them, no relief could be granted under any set of facts to be proved. *Watts v. Internal Revenue Service*, 925 F.Supp. 271, 275 (D.N.J.1996). Although this Court must for the purposes of a Rule 12(b)(6) motion read the complaint indulgently, the Court is not required to accept as true unsupported conclusions and unwarranted inferences. *Schuylkill Energy Resources v. PP & L*, 113 F.3d 405, 417 (3d Cir.1997). There must be an actual, actionable claim underlying the complaint's allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

 Defendant insurers argue that this Court must dismiss this action because state law does not permit the action since plaintiffs do not have an unsatisfied judgment. Plaintiffs, however, argue that they may proceed against the insurance companies to determine their rights under the Armstrong policies because they indeed have the equivalent of an unsatisfied judgment. The Court finds that New Jersey law applies to this dispute.[7]

It is clear that an insurer remains liable for a debt even if the insured is discharged from its responsibility to pay the debt in bankruptcy. 11 U.S.C. § 524(e); *First Fid. Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir.1993) (stating that section 524(e) "assures creditors that the discharge of a debtor will not preclude them from collecting the full amount of debt from [the debtor's insurers]"). New Jersey statutory law echoes this insurer responsibility in N.J.S.A. 17:28–2 which provides:

> No policy of insurance against loss or damage resulting from accident to or injury suffered by an employee or other person and for which the person insured is liable ... shall be issued or delivered in this state by any insurer authorized to do business in this state, unless there is contained within the policy a provision that the insolvency or bankruptcy of the person insured shall not release the insurance carrier from the payment of

---

7. On April 18, 2002, almost one month after the briefs were filed for this motion, counsel for plaintiffs submitted a "brief supplement" to their opposition in which they urged this Court to consider an argument they "omitted to argue in their brief," namely, that "in the alternative, Pennsylvania law should apply to the contract of insurance issued to a corporation with its principal place of business in Pennsylvania." (Pls.' 4/18/02 Ltr. at 1.) Defendants contested the late submission. (Def.'s 4/18/02 Ltr.) This Court finds that the submission is irrelevant because New Jersey law applies to this dispute.

As the forum state, New Jersey choice of law rules apply. New Jersey abandoned the traditional *lex loci contractus* rule which required application of the law of the place where the contract was entered in favor of the flexible "governmental interest" approach which focuses on the state that has the most significant connections with the litigation. *Gilbert Spruance v. Pa. Mfrs.*, 134 N.J. 96, 102, 629 A.2d 885 (1993) (citing *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 417 A.2d 488 (1980)).

Under the governmental interest approach, the court must first determine whether there is an actual conflict between the competing laws. Here, the statutes cited by the parties, N.J.S.A. 17:28–2 and 40 P.S. § 117, are identical. As a result, forum law should apply.

damages for injury sustained or loss occasioned during the life of the policy ...

The defendant insurers do not contest their liability for the debt under this section, but argue that plaintiffs cannot yet bring a direct action against them for the damages. They cite N.J.S.A. 17:28–2 for the proposition that plaintiffs cannot file an action against them until it has sought payment of a judgment from Armstrong. N.J.S.A. 17:28–2 provides that in New Jersey, insurance policies must include a clause that states:

> that in case execution against the insured is returned unsatisfied in an action brought by the injured person, or his personal representative in case death results from the accident, because of insolvency or bankruptcy, then an action may be maintained by the injured person, or his personal representative, against the corporation under the terms of the policy for the amount of the judgment in the action not exceeding the amount of the policy.

The New Jersey courts, therefore, have found that a plaintiff must obtain a judgment against the insured, execute that judgment, and receive the judgment back unsatisfied from the insured because of insolvency or bankruptcy before the plaintiff can institute an action against the insurance company. *See Kabinski v. Employers' Liab. Assur. Corp.*, 123 N.J.L. 377, 8 A.2d 605, 606 (1939) (finding plaintiffs have no rights against insurance policy until they have an unsatisfied judgment against the insured); *Univ. Indem. Ins. Co. v. Caltagirone*, 119 N.J. Eq. 491, 182 A. 862, 863 (1936) (stating that it is "quite apparent that the condition precedent to a legal action" against the insurer "is the return unsatisfied of an execution against the insured"); *Saxon v. United States Fid. & Guar. Co.*, 107 N.J.L. 266, 153 A. 596, 598 (1931) (explaining that plaintiffs cannot recover from insurer unless "an execution was returned unsatisfied because of the insolvency or bankruptcy of the [insured]"). The statutory requirement provides the:

> minimal protection intended by legislative policy for the benefit of those who might suffer harm at the hands of the [insured] person. It does not discourage nor prevent the inclusion of terms in a policy which are more broad or generous.

*Clement v. Atl. Cas. Ins. Co.*, 25 N.J.Super. 96, 102–03, 95 A.2d 494 (1953) (distinguishing case where policy allowed direct suit without need for unsatisfied judgment from those where policy terms "closely followed the statute").

 Here, the parties have not submitted the applicable Central National, CGU, and Liberty Mutual policies. As a result, this Court does not know whether the policies mirror the statutory requirement or allow a direct action without execution of a judgment.[8] However, statutory law

---

**8.** Liberty Mutual did submit one page of its insurance policy, which provides, in pertinent part:

**Action Against Company**

No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant, and the company ...

No person or organization shall have any right under this policy to join the company in any action against the insured to determine the insured's liability, nor shall the company be impleaded by the insured or his legal representative ...

While Liberty Mutual argues that this "no action" clause prevents this suit, it is clear that this action is not one "against the insured to determine the insured's liability." Arm-

makes clear that, at a minimum, the policies must allow plaintiffs to proceed against the insurance companies if they have a judgment against Armstrong and attempt to execute the judgment, but receive it back unsatisfied due to Armstrong's bankruptcy.

■ It is clear that there is a conceivable set of facts under which plaintiffs could show that they have met these requirements. Plaintiffs have submitted the stipulation and order signed by Randall J. Newsome, United States Bankruptcy Judge for the District of Delaware on May 3, 2002 which states that:

> For purposes of the Maertin Plaintiff's rights against the Insurance Policies and the Insurance Proceeds under N.J.S.A. 17:28–2, AWI's failure to pay the Settlement Amount shall be deemed to be equivalent to the return of an execution unsatisfied against AWI for the Settlement Amount.

(Pl.'s Br., Ex. A at 4.) While defendants presented evidence that they are contesting the validity of this order in the Delaware Bankruptcy Court,[9] for the purposes of this motion to dismiss, it is presumed that the order is valid and that it satisfied the execution requirement of New Jersey statutory law to allow plaintiffs to proceed against the insurers.

■ Even if the order was not valid, there still remains a conceivable set of facts that could allow plaintiffs to proceed against the insurers. Plaintiffs possess a judgment against Armstrong in the

amount of $7,000,000 entered by this Court on September 5, 2002 in *Maertin I* and Armstrong remains under the protection of the bankruptcy court. Therefore, it is presumed that pursuant to Judge Farnan's order, plaintiffs have attempted to execute the judgment against Armstrong and have had it returned unsatisfied due to Armstrong's bankruptcy.

As a result, this Court will deny the motions of defendants Central National, CGU Group, and Liberty Mutual to dismiss for failure to state a claim under New Jersey statutory law.

### C. *Liberty Mutual's Motion to Dismiss Under First–Filed Rule*

■ Defendant Liberty Mutual also asks this Court to dismiss plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(6), arguing that the action is barred by the "first-filed rule." (Liberty Mutual Br. at 4.) Liberty Mutual argues that this action, filed November 14, 2001, is "substantially duplicative" to the action that Armstrong filed in the Eastern District of Pennsylvania on September 20, 2000, *Armstrong World Industries, Inc. v. Central National Insurance Co. of Omaha, et al.,* Civil Number 00–4763.

■ The "first-filed" rule was adopted in the Third Circuit in 1941 to "encourage sound judicial administration and promote comity among federal courts of equal rank." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925 (3d Cir.1941). The rule stands for the principle that generally, in cases of federal concurrent jurisdiction,

---

strong's liability was already determined in *Maertin I. See, e.g. Apalucci v. Agora Syndicate, Inc.,* 145 F.3d 630, 633 (3d Cir.1998) (stating that no action clause did not apply when "fact and amount of insured's liability have been conclusively established by an enforceable court judgment").

**9.** The docket of bankruptcy action 00–4471 shows that defendants' May 13, 2002 motion

for reconsideration of the May 3, 2002 stipulation and order was denied. Defendants then filed Civil Action Number 02–1390 on August 16, 2002 to appeal the denial to the United States District Court for the District of Delaware. To date, the appeal has not been decided.

"the court which first has possession of the subject must decide it." *EEOC v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir.1988) (quoting *Crosley*, 122 F.2d at 929). The rule, thus, gives the district court the authority to enjoin "the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *Univ. of Pa.*, 850 F.2d at 971.

Although exceptions to the rule are rare, it is not a "rigid or inflexible rule to be mechanically applied" because it is grounded in principles of equity. *Univ. of Pa.*, 850 F.2d at 976–77 (quoting *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir.1982)). Its primary purpose is to "avoid burdening the federal judiciary and to prevent the judicial embarrassment of conflicting judgments." *Univ. of Pa.*, 850 F.2d at 977 (citing *Church of Scientology v. United States Dept. of Army*, 611 F.2d 738, 750 (9th Cir.1979)). Therefore, a court may deviate from the rule as long as it acts "with regard to what is right and equitable under the circumstances and the law, and [is] directed by the reason and conscience of the judge to a just result." *Univ. of Pa.*, 850 F.2d at 977 (quoting *Langnes v. Green*, 282 U.S. 531, 541, 51 S.Ct. 243, 75 L.Ed. 520 (1931)).

The rule only applies when two district courts have jurisdiction of the "same parties and issues." *Triangle Conduit & Cable Co. v. Nat'l Elec. Prods., Corp.*, 125 F.2d 1008, 1009 (3d Cir.1942); *see also Congress Credit Corp. v. AJC Int'l, Inc.*, 42 F.3d 686, 689 (1st Cir.1994) (holding that actions were not "duplicative" when different plaintiffs were in-

volved in actions); *Remington Rand Corp. v. Bus. Sys., Inc.*, 830 F.2d 1274, 1276 (3d Cir.1987) (finding rule applied where case involved "precisely the same parties as the ongoing plenary action"); *Univ. of Pa.*, 850 F.2d at 971 (stating rule applies when subsequent action involves "same parties and same issues").

Here, therefore, the rule does not apply. Armstrong brought the Pennsylvania action against its insurers for a declaration of coverage. (Sullivan Cert., Ex. A.) The Maertin plaintiffs brought the current New Jersey action against Armstrong and its insurers for payment of the settlement amount. (Raditz Cert., Ex. D.) Liberty Mutual argues that both actions "at their core" involve the applicability of the insurance policies to plaintiffs' claim. (Liberty Mutual Br. at 6.) However, the actions are not between the same parties, so this Court cannot dismiss this case under the first-filed rule.

**D.** ***Liberty Mutual and Michael Carroll's Motion to Dismiss for Lack of Standing to Bring a Bad Faith or Fraud Claim***

Liberty Mutual and Michael Carroll argue that this Court should dismiss the bad faith claims asserted against them in Count II of plaintiffs' complaint because plaintiffs do not have standing to assert such claims. (Liberty Mutual Br. at 8.) Plaintiffs argue that they have standing because Armstrong, by signing the settlement agreement, assigned them rights in the insurance proceeds which provide them standing to maintain the bad faith claims. (Pls.' Br. at 11.) This Court will dismiss plaintiffs' bad faith claims against Liberty Mutual.[10]

---

**10.** This Court will not consider whether the fraud claims asserted against Liberty Mutual in Count II of plaintiffs' complaint should be dismissed because Liberty Mutual and Mi-

chael Carroll have not moved for the dismissal of such claims. It also seems clear that even if plaintiffs do not have standing to assert a bad faith claim against the insurers,

An insurance company has the duty to protect its insured, the debtor, during the settlement of the insured's claims. Am.Jur.2d § 378. As a result, the insured may bring an action against the insurance company for breach of this duty of good faith and fair dealing that is implied into the insurance contract by law. *See, e.g.* Am.Jur.2d § 378; *Brown v. Candelora*, 708 A.2d 104, 109 (Pa.Super.1998); *Williams v. Transport Indem. Co.*, 157 Cal.App.3d 953, 203 Cal.Rptr. 868 (1984); *Rumley v. Allstate Indem. Co.*, 924 S.W.2d 448 (Tex.App.).

The "vast majority" of courts, though, have held that because the insurance company does not have a duty to protect the insured's creditors, a debtor's tort judgment creditor does not have standing to sue the debtor's insurance company for bad faith settlement negotiations. *Bean v. Allstate Ins. Co.*, 285 Md. 572, 403 A.2d 793, 794 (1979) (citing cases); *see also* Am.Jur.2d § 378. The tort judgment creditor is considered a "stranger" to the insurance contract as he is not a party or a third-party beneficiary to it. *Gen'l Accident Ins. Co. v. N.Y. Marine and Gen'l Ins. Co.*, 320 N.J.Super. 546, 553–54, 727 A.2d 1050 (App.Div.1999); *Murray v. Allstate Ins. Co.*, 209 N.J.Super. 163, 169, 507 A.2d 247 (App.Div.1986); *Biasi v. All-*

*state Ins. Co.*, 104 N.J.Super. 155, 159, 249 A.2d 18 (App.Div.1969). Unless the insured/debtor, to whom the insurance company owes the duty, assigns his rights in the contract to the creditor, the creditor cannot proceed against the insurance company for bad faith settlement negotiations. *Murray*, 209 N.J.Super. at 169, 507 A.2d 247 (stating that insured must affirmatively, by assignment, authorize third party to prosecute claim). New Jersey statute 17:28–2, which provides a creditor the right to proceed against the insurance company in cases of bankruptcy,[11] does not change the result because it only gives the third party the right to proceed against the insurance company for the unsatisfied judgment amount, not for additional bad faith damages. *Id.*

Here, plaintiffs allege that Liberty Mutual exercised bad faith in the settlement negotiations by not informing plaintiffs that Armstrong was going to file bankruptcy. Under New Jersey law, plaintiffs cannot bring a bad faith negotiation claim against Liberty Mutual because they have failed to show that Armstrong assigned its right to bring such a claim against Liberty Mutual.[12] As a result, this Court will grant Liberty Mutual's motion to dismiss as to the bad faith claims in Count II of plaintiff's complaint.[13]

---

they certainly have standing to assert that they were injured by an insurance company's fraudulent conduct.

**11.** *See* section II(B) *supra.*

**12.** Plaintiffs argue that the settlement agreement should be construed to create an assignment of Armstrong's interest in the insurance proceeds which should provide them with standing to bring the bad faith claim against Liberty Mutual. However, the New Jersey Appellate Division explained,

[w]hether the rationale be that of third-party beneficiary, a right accorded by statute, some judicially-fashioned common-law remedy or otherwise, a *sine qua non* is that

the insured be dissatisfied and expressly and affirmatively take steps to prosecute [a bad faith] claim or, by assignment, authorize another person to do so.

*Murray*, 209 N.J.Super. at 169, 507 A.2d 247. Therefore, without an affirmative assignment on the part of Armstrong, plaintiffs cannot bring this claim.

**13.** The fraud claims in plaintiffs' brief have not been dismissed as to defendants Liberty Mutual and Michael Carroll. The factual basis of the fraud and bad faith claims are quite similar, because "[e]very fraud in its most general and fundamental conception consists of the obtaining of an undue advantage by means of some act or omission that is uncon-

### E. *Armstrong and Bethann Jakobo-ski's Motion to Dismiss for Failure to Plead Bad Faith Claim with Specificity*

Defendants Armstrong and Bethann Jakoboski filed their motion to dismiss, arguing that the bad faith and fraud claims brought against them in Count II of plaintiffs' complaint must be dismissed because they were not plead with requisite specificity. (Armstrong Br. at 9.)

Fed.R.Civ.P. 9(b) states that "[i]n all averments of fraud . . ., the circumstances constituting the fraud . . . shall be stated with particularity." When addressing motions to dismiss for failure to plead fraud with particularity, though, the Third Circuit has held that courts should not focus on the particularity requirements of Fed.R.Civ.P. 9(b) without considering "the general simplicity and flexibility contemplated by the rules." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985) (citing *Christidis v. First Pa. Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983)). Courts therefore must remember that the purpose of Rule 9(b)'s particularity requirement is to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral or fraudulent behavior." *Id.* Allegation of the particular time, place, and date of fraudulent acts satisfies these requirements, but the Third Circuit recognizes that plaintiffs can also fulfill the requirements of Rule 9(b) through other means which "inject precision and some measure of substantiation into their allegations of fraud." *Id.*

Here, plaintiffs have met this standard. They indicated that the time, place, and date of the fraudulent conduct was during the "settlement negotiations" that led to the September 2000 settlement agreement that was fully executed by November 22, 2000. (Pls.' Complaint ¶¶ 53–54.) They explained that the subject matter of the allegedly fraudulent representations dealt with the "availability of insurance coverage to satisfy the agreed-upon sum" and with "Armstrong's intention to file for protection of Chapter 11 of the United States Bankruptcy Code." (*Id.* at ¶ 56.) They also alleged that the representations were made by Armstrong's employee Bethann Jakoboski, Esquire. (*Id.* at ¶¶ 52–53.) Therefore, this complaint satisfies the requirements of *Seville* because it "sets forth the nature of the alleged misrepresentations" even if it "does not describe the precise words used" and it "indicate[s] who made the representations to whom, and the general content of the representations." *Seville,* 742 F.2d at 791; *Saporito v. Combustion Eng'g, Inc.,* 843 F.2d 666, 675 (3d Cir.1988), vacated on other grounds, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989) (describing *Seville* complaint). Therefore, this Court will deny the motion of Armstrong and Jakoboski to dismiss on this ground.

### F. *Armstrong's Motion to Dismiss as Violative of the Entire Controversy Doctrine*

Defendant Armstrong next argues that plaintiffs' claims must be dismissed under the entire controversy doctrine because plaintiffs should be required to bring all their claims in the *Maertin I* lawsuit. (Armstrong Br. at 25.) It argues that this

---

scientious or a violation of good faith." *N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.,* 319 N.J.Super. 435, 445, 725 A.2d 1133 (App.Div. 1998) (quoting *Jewish Ctr. of Sussex County v.*

*Whale,* 86 N.J. 619, 624, 432 A.2d 521 (1981)). However, they are distinct causes of action and Liberty Mutual has only moved to dismiss the bad faith claims.

*Maertin II* action is an "unnecessary and inappropriate duplication of litigation" because the factual elements underlying the claims are "identical and the relief requested in the first case is essentially the same as the relief sought in this proceeding." (*Id.* at 25–26.)

New Jersey's entire controversy doctrine functions on the premise that "the adjudication of a legal controversy should occur in one litigation in one court." *Fornarotto v. Am. Waterworks Co.*, 144 F.3d 276, 278 (3d Cir.1998) (quoting *Venuto v. Witco Corp.*, 117 F.3d 754, 761 (3d Cir. 1997)). As a result, "all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy." *Id.*

The New Jersey Supreme Court has explained that the main test to determine whether the entire controversy doctrine applies is whether "the claims against the different parties arise from related facts or the same transaction or series of transactions." *DiTrolio v. Antiles*, 142 N.J. 253, 267–68, 662 A.2d 494 (1995). This is because "[i]t is the core set of facts that provides the link between distinct claims against the same or different parties and triggers the requirement that they be determined in one proceeding." *Id.* (internal citations omitted). Thus, though the parties and the claims in the second suit may be different than those in the first suit, the second suit may still be barred if it concerns the series of transactions that are already at issue in the first suit. *Id.*

It is through the entire controversy doctrine, which is broader than the traditional res judicata doctrine, that the New Jersey Legislature sought to promote "judicial economy and efficiency by avoiding fragmented, multiple and duplicative litigation." *Fornarotto*, 144 F.3d at 278 (citing

*Venuto*, 117 F.3d at 761). It is meant to constrain a plaintiff from "withhold[ing] part of a controversy for separate litigation even when the withheld component is a separate and independently cognizable cause of action." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 137 (3d Cir.1999).

However, the New Jersey Supreme Court has recognized that the "boundaries of the doctrine are not limitless." *Mystic Isle Dev. Corp. v. Perskie & Nehmad*, 142 N.J. 310, 326, 662 A.2d 523 (1995). It is well recognized that courts should not apply the doctrine to "component claims that are unknown, unarisen, or unaccrued at the time of the action." *Rhodes v. Twp. of Saddle Brook*, 980 F.Supp. 777, 783 (D.N.J.1997) (citing *Mystic Isle*, 142 N.J. at 323, 662 A.2d 523); *see also Riemer v. St. Clare's Riverside Med. Ctr.*, 300 N.J.Super. 101, 109, 691 A.2d 1384 (App.Div.1997) (citing cases). It is only the "knowledge of the existence of a cause of action" during the first proceeding that invokes the entire controversy doctrine. *Riemer*, 300 N.J.Super. at 109, 691 A.2d 1384. The party has such knowledge if she "knows, or should have known, of facts which establish that an injury has occurred and that fault for that injury can be attributed to another." *Id.* (citing *Lynch v. Rubacky*, 85 N.J. 65, 70, 424 A.2d 1169 (1981); *Mystic Isle*, 142 N.J. at 326, 662 A.2d 523 (1995)).

Here, both plaintiffs and defendant Armstrong were parties to the *Maertin I* action. *Maertin I* dealt with Armstrong's liability for the personal injuries of plaintiffs; *Maertin II* deals with Armstrong and its insurers' liability for payment of the settlement agreement which concluded the *Maertin I* personal injury action. *Maertin I* was closed on September 14, 2000 when the parties reported their set-

tlement to this Court.[14] There was no way that plaintiffs could have known that they would have a cause of action against Armstrong for the payment of the settlement agreement or for fraudulent settlement negotiations during the pendency of the *Maertin I* action because payment was not due them until January 21, 2001, over four months after the *Maertin I* action was closed. Therefore, this action does not violate the entire controversy doctrine and this Court will deny Armstrong's motion to dismiss on this ground.

### G. *Armstrong's Motion to Dismiss for Failure to File Bad Faith Claims by Bankruptcy Bar Date*

Defendant Armstrong next argues that this Court must dismiss plaintiffs' bad faith and fraud claims against it because they did not file the claims with the bankruptcy court before the court's "bar date." Plaintiffs argue that the bar date does not apply because the bad faith and fraud claims were not known before the bankruptcy court bar date.

 One of the principal purposes of bankruptcy law is to "secure within a limited period the prompt and effectual administration and settlement of the debtor's estate." *Chemetron Corp. v. Jones,* 72 F.3d 341, 346 (3d Cir.1995) (citing *Katchen v. Landy,* 382 U.S. 323, 328, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966)). As a result, Bankruptcy Rule 3003(c)(3) requires that creditors of the debtor file proofs of their claims prior to a bar date established by

the bankruptcy court. *Chemetron,* 72 F.3d at 346. After the passage of the bar date, the creditor cannot participate in the reorganization unless it can establish sufficient grounds for its failure to file. *Id.* A creditor's failure to file proof of the claim by the bar date, therefore, generally means that its claim will be discharged in bankruptcy even though the creditor receives no payment. *Id.* (citing 11 U.S.C. § 1141).

 The bar date only applies to creditors who have a "claim" before the bankruptcy filing. Bankr.R. 3003(c)(2);[15] *see also In re R.H. Macy & Co.,* 236 B.R. 583, 589 (Bkrtcy.S.D.N.Y.1999) (stating that valid bankruptcy claim depends on whether claimant's right to payment arose before bankruptcy petition was filed). The Bankruptcy Code broadly defines a "claim" as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(4); *see also* Am.Jur.2d § 2358. Regardless of the breadth of the

---

**14.** It is true that motions were filed to enforce the settlement agreement after the *Maertin I* case was closed by this Court. This, however, does not change the fact that *Maertin I* was closed on September 14, 2000 and that after that date, plaintiffs could not add new parties or new causes of action to their *Maertin I* action.

**15.** Bankruptcy Rule 3003(c)(2) provides: Who must file.

Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated, shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.

definition, it still requires a "claim" and not simply an "act done by the debtor." *In re M. Frenville Co., Inc.*, 744 F.2d 332, 335 (3d Cir.1985).[16] "In most cases, the claim will arise simultaneously with the underlying act. But to the extent that the harm is separated from the underlying conduct ... Congress has focused on the harm, rather than the act." *Id.* (defining claim for purposes of section 362(a) automatic stay). The "threshold requirement" of determining whether a creditor has a "claim" for bankruptcy purposes is whether the creditor has a cause of action under state law. *Jones v. Chemetron Corp.*, 212 F.3d 199, 206 (3d Cir.2000) (citing *Frenville*, 744 F.2d at 337).

■ New Jersey law is clear that a plaintiff does not have a cause of action for fraud against a defendant until the plaintiff actually suffers damages because actual damages are an element of the cause of action for fraud.[17] *Holmin v. TRW, Inc.*, 330 N.J.Super. 30, 36, 748 A.2d 1141 (App. Div.2000) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 691 A.2d 350

(1997)). Therefore, because plaintiffs do not have a cause of action for fraud until they have suffered actual damages under New Jersey law,[18] they also do not have a claim against a debtor's bankruptcy estate until they have suffered actual damages.

■ Here, accepting plaintiffs' allegations as true, plaintiffs did not suffer any damages from defendants' alleged bad faith or fraud until they were not paid on January 21, 2001, a date that is after Armstrong's December 6, 2000 bankruptcy filing date.[19] The notice of the bar date clearly stated that "[y]ou MUST file a proof of claim if (i) you have a claim ... that arose prior to December 6, 2000 ... and (ii) it is not an excluded claim." (Gangl Cert., Ex. C at Ex 1.) As a result, because plaintiffs did not have a fraud or bad faith claim until after December 6, 2000, they were not required to file their fraud and bad faith claims with the bankruptcy court by the bar date. Therefore, this Court will deny Armstrong's motion to dismiss the bad faith and fraud claims on this ground.[20]

---

**16.** Armstrong points out that the Third Circuit's decision in *Frenville* has been questioned by other courts. However, as recently as 2000, the Third Circuit stated, "We are cognizant of the criticism the *Frenville* decision has engendered, but it remains the law of this circuit." *Jones v. Chemetron Corp.*, 212 F.3d 199, 206 (3d Cir.2000).

**17.** The five elements of a cause of action for fraud in New Jersey are (1) a material misrepresentation by defendant of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the plaintiff rely on it; (4) reasonable reliance on the statement by the plaintiff; and (5) actual damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350 (1997); *Jewish Ctr. of Sussex County v. Whale*, 86 N.J. 619, 624–25, 432 A.2d 521 (1981); *Holmin*, 330 N.J.Super. at 35, 748 A.2d 1141.

**18.** New Jersey law also includes the discovery rule which states that a plaintiff's cause of action does not accrue until the plaintiff

knows or should know that (1) she has suffered damages and (2) that the damages were caused by the fault of another. *Bernoskie v. Zarinsky*, 344 N.J.Super. 160, 165, 781 A.2d 52 (App.Div.2001). As a result, even if all the facts giving rise to a claim have occurred, the plaintiff still may not have a claim if she neither knew or had reason to know that she was wronged. *Holmin*, 330 N.J.Super. at 48, 748 A.2d 1141.

**19.** While Armstrong argues that plaintiffs were actually harmed the date that it filed bankruptcy because plaintiffs' fraud claim revolves around the bankruptcy filing, this Court still finds that plaintiffs did not have a right to payment until January 21, 2001, and so were not harmed by the deprivation of the settlement monies until then.

**20.** This Court recognizes that plaintiffs were required to file proof of their $7,000,000 settlement agreement claim by the bar date because they had a claim to the $7,000,000

### H. *Armstrong and Jakoboski's Motion for Summary Judgment on Fraud and Bad Faith Claims*

Defendant Armstrong and Jakoboski argue that this Court must grant summary judgment in their favor on the fraud and bad faith claims that plaintiffs have alleged in Count II of their complaint. This Court has considered the claims and will grant summary judgment in favor of Armstrong and Jakoboski on these claims.[21]

#### 1. Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[t]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either par-

---

before the bankruptcy filing. While the claim was contingent on sixty days passing from the November 22, 2000 date that the releases were fully executed, it was still a pre-petition claim under the definition in 11 U.S.C. § 101(4). Plaintiffs timely filed their proof of claim for this amount. (Gangl Cert. ¶ 13, Ex. D.)

21. Plaintiffs' claims against defendant Jakoboski are for actions she took as an employee of Armstrong. Plaintiffs' complaint asserts that Jakoboski "at all times ... was an employee of the defendant Armstrong World Industries, Inc." (Complaint ¶ 52.) Jakoboski stated in her affidavit that during all negotiations in this case, she was "acting within the scope of [her] duties as an employee of [Armstrong]." (Jakoboski Cert. ¶ 3.) Defendants also submitted her status as in-house counsel as a fact "not in dispute." (Statement of Facts ¶ 2.) The parties have presented arguments about whether she can be individually liable for actions taken in the scope of her employment.

New Jersey law is clear that a principal is accountable for an agent's deceit if the agent was acting within the scope of her authority. *Baldasarre v. Butler,* 132 N.J. 278, 289, 625 A.2d 458 (1993). New Jersey law also makes clear that an agent is jointly and severally liable for her own fraudulent acts or false representations, even when they are in furtherance of the corporate business. *See Wright v. New Jersey,* 169 N.J. 422, 443, 778 A.2d 443 (2001) (considering individual liability separate from vicarious liability); *Stephenson v. R.A. Jones & Co.,* 103 N.J. 194, 209, 510 A.2d 1161 (1986) (stating that agent may be liable, but entitled to indemnity from principal if tort was committed in good faith reliance on principal's directions); *Moss v. Jones,* 93 N.J.Super. 179, 225 A.2d 369, (App. Div.1966) (explaining that agent cannot be held liable for contract actions if agent disclosed principal, but that agent can be held liable for tort actions); Am.Jur.2d §§ 317, 1882 (citing cases).

Because plaintiffs have argued the actions of Jakoboski and Armstrong as though they were one and the same, this Court will consider the motion for summary judgment as to defendants Armstrong and Jakoboski together.

ty." *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505; *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 329–30 (3d Cir.1995) (citation omitted).[22]

## 2. Fraud Claims

Armstrong argues that summary judgment must be granted on the fraud claims brought against it in Count II of plaintiffs' complaint because plaintiffs have failed to present evidence that sustains a cause of action for fraud. The fraud claims in the complaint are twofold: (1) that Armstrong made fraudulent representations about the availability of insurance coverage and (2) that Armstrong withheld material information about its imminent bankruptcy filing to induce plaintiffs to enter a settlement agreement that it intended to avoid by filing bankruptcy.

In New Jersey law, as noted above, a plaintiff must prove five elements of common-law fraud: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that plaintiff rely on it; (4) reasonable reliance thereon by plaintiff; and (5) resulting damages. *Gennari,* 148 N.J. at 610, 691 A.2d 350 (citing *Whale,* 86 N.J. at 624–25, 432 A.2d 521). The evidence for each element will next be examined.

### a. Alleged misrepresentation about insurance coverage

 In the first fraud claim, plaintiffs allege that Armstrong made "false representations as to the availability of insurance coverage to satisfy the agreed upon sum." (Complaint ¶ 56.) Armstrong argues that it did not make a misrepresentation because there is no evidence that Armstrong is not covered by insurance. (Armstrong Br. at 17.) Armstrong is correct.

Plaintiffs have never contested the insurance coverage documented within the record. Plaintiffs filed this action against the insurance companies, stating that "[t]here exists under these insurance policies coverage in excess of the $7 million ($7,000,000.00) needed to fund this settlement." (Complaint ¶ 50.) The insurance companies answered the complaint and never claimed that they did not cover Armstrong during relevant policy periods and never argued that such insurance was unavailable. The insurance companies were also active participants in the proceeding where plaintiffs sought relief from the automatic stay, stating that "AWI identified numerous policies providing several layers of excess liability coverage for the relevant time period, 1977 through 1986. Those policies offer hundreds of

---

**22.** The moving party, here Defendant Armstrong, always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, where the nonmoving party bears the burden of persuasion at trial, as plaintiffs do in the present case, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548.

The non-moving party, here plaintiffs, "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed.R.Civ.P. 56(e). They must do more than rely only "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985) (citation omitted); *see Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, if the plaintiff's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505.

millions in coverage." (Raditz Cert., Ex. B at ¶ 22, Ex. C.)

Armstrong said that it had insurance and the record indicates that it did. Plaintiffs' problem is not that Armstrong does not have insurance coverage, but is that Armstrong's insurance coverage is not yet available to make a payment to them because of the current bankruptcy proceeding.[23] As a result, this Court will grant defendant Armstrong's motion for summary judgment on this fraud claim because plaintiffs have not presented anything which even hints that Armstrong did not have the insurance coverage that it disclosed to plaintiffs.

### b. Alleged omission about bankruptcy filing

In the second fraud claim, plaintiffs allege that Armstrong:

> failed to disclose Armstrong's intention to file for protection of Chapter 11 of the United States Bankruptcy Code, and intentionally and maliciously sought the protection of the automatic stay provisions of Chapter 11 of the United States Bankruptcy Code in an attempt to avoid the obligation to pay the above stated sum pursuant to the settlement.

(Complaint ¶ 56.) Armstrong argues that Armstrong's failure to inform plaintiffs of its bankruptcy filing occurred because Armstrong at the time of the settlement negotiations did not know of the filing and that, regardless, it had no duty to disclose such information to plaintiffs. (Armstrong Br. at 19–20.)

The deliberate suppression of a material fact is equivalent to a material misrepresentation if the party has a duty to disclose the fact. *N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.,* 319 N.J.Super. 435, 446, 725 A.2d 1133 (App.Div.1998) (citing

*Strawn v. Canuso,* 140 N.J. 43, 62, 657 A.2d 420 (1995)). The concealed facts must be material facts which "if known, would have prevented [plaintiff] from obligating himself." *Pavonia Rest.,* 319 N.J.Super. at 446, 725 A.2d 1133 (citing *Ramapo Bank v. Bechtel,* 224 N.J.Super. 191, 198, 539 A.2d 1276 (App.Div.1988)). Whether the party has a duty to disclose such facts is a question of law. *United Jersey Bank v. Kensey,* 306 N.J.Super. 540, 551, 704 A.2d 38 (App.Div.1997). Because the duty should arise "where good faith and common decency require it," the question requires "a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *City Check Cashing, Inc. v. Mfrs. Hanover Trust,* 166 N.J. 49, 59, 764 A.2d 411 (2001) (quoting *Kelly v. Gwinnell,* 96 N.J. 538, 544, 476 A.2d 1219 (1984); *Fischer v. Kletz,* 266 F.Supp. 180, 188 (S.D.N.Y.1967)).

There are three general types of transactions where the duty to disclose arises: (1) where a fiduciary relationship exists between the parties, (2) where the transaction itself calls for "perfect good faith and full disclosure", or (3) where one party "expressly reposes a trust and confidence in the other." *Id.; Pavonia Rest.,* 319 N.J.Super. at 446, 725 A.2d 1133 (quoting *Berman v. Gurwicz,* 189 N.J.Super. 89, 93–94, 458 A.2d 1311 (Ch.Div.1981), *aff'd,* 189 N.J.Super. 49, 458 A.2d 1289 (App.Div. 1983)).

The arm's length negotiation of a personal injury settlement ordinarily fits none of these categories of transactions where a higher disclosure duty arises. First, New Jersey law indicates that settlement negotiations did not create a fiduciary relationship between Armstrong and

---

**23.** This Court will consider the allegations of fraud against Armstrong for failure to disclose

the bankruptcy filing in the next section, section G(2)(b).

plaintiffs because "it ordinarily 'would be anomalous to require a [party] to act as a fiduciary for interests on the opposite side of the negotiating table.'" *Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47, 53 (3d Cir.1988) (quoting *Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir.1982)). Second, the transaction did not call for "perfect good faith and full disclosure" because negotiations necessarily include non-disclosure of strategic business information, so long as the other party is not affirmatively misled. It is only when a party makes a disclosure upon the subject during negotiation that it has the duty to clarify the matter and ensure it is truthful. *Strawn v. Canuso,* 271 N.J.Super. 88, 105, 638 A.2d 141 (App.Div.1994) (stating that when one "elects to speak" he must tell the truth if it is apparent that another may reasonably rely on his statements). Finally, no evidence has been offered that indicates that plaintiffs expressed their "trust and confidence" in Armstrong during the settlement negotiations as they were represented by their own able counsel.

■ The precise question whether a corporate defendant engaging in settlement negotiations for a long-term payout to settle a multi-party personal injury case has a duty to disclose that the filing of a Chapter 11 petition is imminent need not be decided here, for it is clear upon the record that Armstrong's negotiators and their superiors lacked such knowledge at the relevant times. Plaintiffs have not presented proof of the remaining four elements of common law fraud: knowledge or belief by the defendant of its falsity, an intention that plaintiff rely on it, reasonable reliance thereon by plaintiff, and resulting damages. Plaintiffs have not shown that Armstrong's attorney, BethAnn Jakoboski, had knowledge or belief of the falsity of any statements that she made during the negotiations that culmi-

nated in the September 14, 2000 settlement agreement. They have presented nothing which contradicts Jakoboski's affidavit in which she states that "[b]efore AWI's public disclosure on November 14, 2000 of the potential of a bankruptcy filing, I had no knowledge that AWI was contemplating the possibility of a bankruptcy filing." (Jakoboski Cert. ¶¶ 4, 6.) If Jakoboski had no knowledge of the bankruptcy filing, she could not have withheld the information with the intention that plaintiff rely on its nonexistence.

Plaintiffs have also not contradicted evidence that Jakoboski's superiors at Armstrong did not know of the bankruptcy filing at the time of these pre-September 14, 2000 negotiations. The parties reported their settlement agreement on September 14, 2000. Plaintiffs submitted an October 3, 2000 letter that indicates revisions to the agreement, (Raditz Cert., Ex. B at Ex. A), and an October 31, 2000 letter with plaintiffs' signature pages enclosed, (*Id.,* Ex. B at Ex. B). It was not until November 14, 2000 that Armstrong filed its quarterly report with the Securities and Exchange Commission which caused the reaction from the press that "[i]f Armstrong does not obtain sufficient additional liquidity in the next few months, Armstrong will have to consider seeking protection under the U.S. Bankruptcy Code." (Gangl Cert. ¶¶ 8, 9, Ex. A.)

In support of its argument that Armstrong was not fully aware of the bankruptcy filing at the time of the *Maertin I* negotiations, Armstrong submitted the affidavit of William C. Rodruan, the Vice President and Controller of Armstrong. (Gangl Cert., Ex. B.) He stated that Armstrong did not file bankruptcy because of "operational difficulties, problems in its industry or an overleveraged balance sheet." (Gangl Cert., Ex. B at ¶ 16.) Instead, it chose to file because "[c]hapter 11 provides

a forum in which AWI can finally resolve its legal liability for asbestos-related claims in a fair, equitable and efficient manner." (*Id.*) On September 30, 2000, about 173,000 asbestos-related personal injury and wrongful death claims were pending against Armstrong. (*Id.* at ¶ 26.) Vice President Rodruan explained that, as of September 30, 2000, Armstrong had credit facilities that it had historically used to support issuances of commercial paper and was negotiating with lenders to obtain a new $400 million credit facility. (*Id.* at ¶ 29.) However, on October 5, 2000, Armstrong's co-defendant in many of the asbestos cases, Owens–Corning Fiberglass ("OCF"), filed a Chapter 11 petition which caused Armstrong's lenders to reevaluate their credit exposure to Armstrong, and the new credit facility was never formed. (*Id.*) On October 25, 2000 and November 17, 2000 Standard & Poors and Moody's Investors Services downgraded Armstrong's debt ratings to "below investment grade." (*Id.* at ¶ 30.)

The record thus shows that Armstrong could not have known that it was going to file bankruptcy during the *Maertin I* negotiations because events subsequent to the September 14, 2000 settlement agreement spurred Armstrong's decision to file bankruptcy. To the contrary, the evidence shows that Armstrong engaged in business-as-usual until after October 5th when OCF's filing caused a reassessment. Because plaintiffs have not offered anything to refute Armstrong's explanation for its filing or its timeline of events, they have not shown that Armstrong knew of the imminent bankruptcy filing at any material time and knowingly failed to disclose it during the settlement negotiations.

Plaintiffs also have not shown that they reasonably relied on the alleged misrepresentations or that they suffered damages because of their reliance. They have not presented any evidence at all that indicates what they would have done had they known of the imminent bankruptcy filing. In September 2000, when the alleged nondisclosure occurred, plaintiffs needed to choose whether to settle their case or continue to trial. Plaintiffs have not shown that they would have chosen to proceed to trial if they had known about the bankruptcy filing.

They also have not shown that they were damaged by the filing. The record shows that Armstrong was going to file bankruptcy regardless of whether plaintiffs settled or tried their claims. Plaintiffs have not presented any proof that the valuation of their claim would have been greater, or that their recovery of amounts from Armstrong would have been sooner, if they had proceeded to trial instead of entering the settlement agreement.

In sum, plaintiffs have not presented any evidence of fraud on the part of Armstrong beyond a timeline of events that appears suspicious. It is true that Armstrong's representative asked that it not be required to pay the $7,000,000 settlement amount until sixty days after all parties had signed the settlement agreement, that Armstrong filed bankruptcy within those sixty days, and that plaintiffs have not yet received the settlement amount. But these circumstances, alone, do not provide proof of actionable fraud and this Court must grant Armstrong's motion for summary judgment on the fraud claims in Count II of plaintiffs' complaint.

### 3. Bad Faith Claims

■ Armstrong also argues that this Court must grant summary judgment in its favor on the bad faith claim contained in Count II of plaintiffs' complaint because plaintiffs have failed to state a legal cause of action for bad faith. The claim alleges that Armstrong breached its implied duty

of good faith and fair dealing contained within the settlement agreement when it filed bankruptcy. (Pls.' Br. at 9.)

▮ It is true that an implied duty of good faith and fair dealing is implied into all contracts in New Jersey. *Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 420, 690 A.2d 575 (1997) (citing cases). The New Jersey Supreme Court explained the duty as requiring that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Palisades Props., Inc. v. Brunetti,* 44 N.J. 117, 130, 207 A.2d 522 (1965)). It is also true that the settlement agreement entered into by the parties in this case is an enforceable contract. (*Maertin I,* Order of 9/5/02.) Plaintiffs argue that Armstrong breached the implied duty of good faith when it filed bankruptcy because it injured their right to receive the fruits of their contract.[24]

▮ It is true that plaintiffs' payment has been delayed because the filing of a bankruptcy petition "suspends the normal operation of the rights and obligations between a debtor and its creditors." *Kernan v. One Washington Park Urban Renewal Assoc.,* 154 N.J. 437, 446, 713 A.2d 411 (1998) (citing 9 Am.Jur.2d Bankruptcy § 1). However, plaintiffs' right to the "fruits" of their settlement contract remain. Their payment has not been avoided; it has merely been postponed.

Chapter 11 was enacted to allow a financially distressed business to restructure its finances so it may "continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders." H.R.Rep. No. 95–595, U.S. Code Cong. & Admin. News 1978, p. 5787. The House recognized that, because of the reorganization, "[c]ash flow problems may develop, and require creditors of the business ... to wait for payment of their claims." *Id.* Indeed, this postponement is part of the fundamental scheme of the reorganization provisions. The Third Circuit explained it as follows:

> it is the basic purpose and scheme of the corporate reorganization provision of the Bankruptcy Act to enable a financially embarrassed debtor to postpone payment of accumulated financial obligations until there can be formulated and approved a fair and feasible plan for satisfying those obligations without liquidating the burdened enterprise.

*In re Penn Central Transp. Co.,* 467 F.2d 100, 102 (3d Cir.1972), quoted in *In re Century City, Inc.,* 8 B.R. 25, 31 (Bkrtcy. D.N.J.1980). As a result, it is the "right and duty of the reorganization court under federal law to defer payment to pre-reorganization creditors." *Penn Central,* 467 F.2d at 102.

Plaintiffs do not have a claim for breach of the duty of good faith because they still retain their claim to the settlement amount. Their settlement agreement, like any other contract, is subject to the parties' rights under the Bankruptcy Code. Plaintiffs' theory of harm arising from the extent to which the provisions of bankrupt-

---

24. This Court recognizes that plaintiffs have not asserted a bad-faith filing claim. A debtor must have a good faith reason for filing an action under Chapter 11, and the bankruptcy court, using its equitable powers, may dismiss a petition for bad faith filing. *In re SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir.1999) (citing 11 U.S.C. § 1112(b)). Plaintiffs have not indicated that such an issue was raised before the bankruptcy court and this Court may assume, because the bankruptcy court has not dismissed the Armstrong action, that the case was filed in good faith.

Their bad faith claim instead asserts that Armstrong's act of filing the bankruptcy petition alone breached its duty of good faith and fair dealing because plaintiffs have not received the settlement amounts due them.

cy law burden their contract with the debtor is merely a consequence of the operation of bankruptcy law itself. It may be unfortunate, or even a hardship, that plaintiffs must continue to wait for payment of the claim, but such is the reality of the bankruptcy system that defers the payment of claims until they can be paid in accordance with an approved plan of reorganization. Because this payment deferral is not alone sufficient to sustain a claim for breach of the duty of good faith and fair dealing based on injury to the "fruits of the contract," this Court must grant Armstrong's motion for summary judgment as to the bad faith claims.

### III. *CONCLUSION*

For the foregoing reasons, this Court will deny the motion to dismiss of defendants Central National and CGU Group, will deny in part the motion to dismiss of defendants Liberty Mutual and Michael Carroll as to the claims in Count I of plaintiffs' complaint and the fraud claims in Count II of plaintiffs' complaint but will grant it in part as to the bad faith claims in Count II of plaintiffs' complaint, and will deny the motion to dismiss of defendants Armstrong World Industries and Bethann Jakoboski but will grant the motion for summary judgment of defendants Armstrong and Jakoboski as to the bad faith and fraud claims in Count II of plaintiffs' complaint. The accompanying Order is entered.

### ORDER

This matter having been brought before this Court upon the motion to dismiss of defendants Cravens, Dargan Co., Pacific Coast, as managing general agent for Central National Insurance Co. of Omaha, and OneBeacon Insurance Co., formerly CGU Group, successor to Potomac Insurance Co., [Docket Item 17–1], and upon the motion to dismiss of defendants Liberty Mutual Insurance Company and Michael Carroll, [Docket Item 38–1], and upon the motion to dismiss or for summary judgment of defendants Armstrong World Industries and Bethann Jakoboski, [Docket Item 24–1]; and the Court having considered the parties' written submissions; and for the reasons expressed in Opinion of today's date;

**IT IS,** this 11th day of December, 2002, hereby

**ORDERED** that the motion to dismiss of defendants Cravens, Dargan Co., Pacific Coast, as managing general agent for Central National Insurance Co. of Omaha, and OneBeacon Insurance Co., formerly CGU Group, successor to Potomac Insurance Co., [Docket Item 17–1] be, and hereby is, *DENIED;* and

**IT IS FURTHER ORDERED** that the motion to dismiss of defendants Liberty Mutual Insurance Company and Michael Carroll [Docket Item 38–1] be, and hereby is, *DENIED IN PART* as to the claims in Count I of plaintiffs' complaint and the fraud claims in Count II of plaintiffs' complaint and *GRANTED IN PART* as to the bad faith claims in Count II of plaintiffs' complaint; and

**IT IS FURTHER ORDERED** that the motion to dismiss of defendants Armstrong World Industries and Bethann Jakoboski [Docket Item 24–1] be, and hereby is, *DENIED;* and the motion for summary judgment of defendants Armstrong World Industries and Bethann Jakoboski as to the bad faith and fraud claims in Count II of plaintiffs' complaint [Docket Item 24–1] be, and hereby is *GRANTED.*